## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PETER GRAYSON, on behalf of himself and all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DR. ING. H.C. F. PORSCHE AG, PORSCHE CARS NORTH AMERICA, INC., VOLKSWAGEN AG and VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey Corporation,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff Peter Grayson alleges for his class action complaint the following through his attorneys Squitieri & Fearon, LLP, on behalf of himself and all others similarly situated based on personal knowledge as to his own vehicle and upon information and belief as to all other matters.

### PRELIMINARY STATEMENT

1.      This is a class action brought by the Plaintiff, Peter Grayson ("Plaintiff"), on behalf of himself and all other similarly situated purchasers  and lessees of Porsche vehicles from model years 2014 through 2019 which, with the sunsetting of 3G services by wireless carrier partners, will no longer be able to operate the functions of the "Porsche Connect" systems installed in the "Cars," as detailed herein.  Porsche has admitted and published the models and years of vehicles with now inoperable "Porsche Connect" features. Defendants made numerous representations and provided warranties in their marketing of the Cars regarding the Porsche Connect systems, when in fact, the Cars' Porsche Connect features were only temporary due to the design of Porsche's factory equipped 3G only telematics systems installed in the Cars. The Class Vehicles' internet enabled features such as roadside emergency safety features were

rendered inoperable after the 3G phase out in 2022 due to defendants' use of obsolete telematics equipment they installed in the Class Vehicles.

2.      The cars affected are: "911" for model years 2017-2019; "Cayenne" for 2015-2019; "Macan" for 2017-2018; "718" for 2017-2021; "Panamera" for 2014-2018 and the "918 Spyder" for 2014 (collectively the "Cars").

3.      Defendants' representations about Porsche Connect were false and misleading.  In the months and years following the introduction of Porsche Connect, as the phasing out of 3G service was being planned and 4G and 5G service was being phased in, Defendants never disclosed until 2022 that the "telematics" in the Cars had been built and installed with 3G only capabilities and that Porsche Connect would not be operable on any generation beyond 3G (hereinafter referred to as "3G Only Limitations"). Defendants have publicly stated that "some vehicles may be eligible for a "technology upgrade"" but have not released any public details on the nature, timing or cost of any such upgrades.

4.      By making ubiquitous misrepresentations about Porsche Connect and the Cars, Defendants (i) engaged in deceptive  acts in violation  of New Jersey's Consumer Fraud Act (the "NJCFA"), N.J. Stat. § 568-2, *et seq;* and (ii) breached express and implied warranties  by description  in violation  of N.J.  Stat. $  12A:2-313(b) (which is also known  as UCC § 2-313(b); violated the Magnuson-Moss Warranty Act, and committed other wrongdoing.  Defendants are liable to Plaintiff and all other similarly  situated members  of the Class defined below for all damages  resulting  from the claims herein.

5.      This action was commenced to obtain recompense for Class Vehicles whose telematics were rendered inoperable when 3G as phased out, or repair, retrofit or replacement of 3G telematics.

## PARTIES

6.     Plaintiff Peter Grayson ("Grayson") is a resident of the state of New Jersey who purchased a 2018 Porsche Panamera 4S in or about October 31, 2018 from Porsche Monmouth ("Vehicle") as a "new vehicle" in New Jersey. Marketing materials promoting the Vehicle promised Porsche Connect features.

7.     Defendant VWGoA is an entity incorporated in New Jersey with its principal place of business and headquarters at 220 Ferdinand Audi Drive, Herndon, Virginia 20171. VWAG selected New Jersey for the original site of VWGoA's headquarters and chose to have VWGoA incorporated as a New Jersey entity. According to its website VWGoA "houses the U.S. operations" of a worldwide family of brands including Volkswagen, Audi, Bentley, Bugatti, and Lamborghini brands, as well as the activities of its 6,000 employees and its subsidiary, VW Credit, Inc. Defendant designed, manufactured distributed, marketed, and sold the Class Vehicles, through its extensive network of authorized dealerships in the United States.

8.     Defendant Dr. Ing. h.c. F. Porsche AG ("Porsche AG") is a German corporation with its principal place of business located in Stuttgart, Germany. Porsche AG designs, develops, manufacturers, and sells luxury automobiles. Porsche AG is a wholly-owned subsidiary of VW AG. Porsche AG engineered, designed, developed, manufactured, and installed the software on the Class Vehicles and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States. On information and belief, Porsche AG also reviewed and approved the marketing and advertising campaigns designed to sell the Porsche-branded Class Vehicles.

3

9.      Porsche and VWGoA, under the supervision of defendant, Volkswagen AG, also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

10.     Porsche Cars North America, Inc. ("Porsche America") is a Delaware corporation with its principal place of business located at 1 Porsche Drive, Atlanta, Georgia 30354. Porsche American is a wholly-owned U.S. subsidiary of Porsche AG, and it engages in business, including the advertising, marketing and sale of Porsche automobiles, in all 50 states.

11.     Volkswagen AG ("VW AG") is a German corporation with its principal place of business in Wolfsburg, Germany, it is the parent of Porsche, Audi and VWG of A. VW AG is one of the largest automobile manufacturers in the work, and is in the business of designing, developing, manufacturing, and selling automobiles. VW AG is the parent corporation of Porsche AG. Upon information and belief, VW AG reviewed and approved Porsche's vehicle designs, testing strategies, and marketing materials.

12.     Porsche America (i) is the exclusive distributor of Porsche automobiles in the United States; (ii) imports into and marketed Porsche automobiles in the United States, and sold Porsche automobiles to authorized Porsche dealers, who in turn sold and leased Porsche automobiles to purchasers and lessees;  (iii) provided marketing,  sales, parts, service, technology, and training support to Porsche automotive retailers in the United States; and (iv) performing these functions, Porsche America has created and disseminated the misrepresentations described in this complaint.

13.     As the exclusive distributor of Porsche automobiles in the United States, performing these functions, Porsche America has created and disseminated the misrepresentations described in this complaint.

14.    In 2009, Porsche and Volkswagen formed an "Integrated Automotive Group" to merge their car manufacturing operations. All models of Porsche are manufactured in Germany, Slovakia and/or Finland.

15.    Porsche AG and VW AG have designed the Cars to allow its Porsche Connect telematics to be inoperable with the phasing out of 3G. Porsche AG and VW AG controls and oversees all aspects of Porsche America's operations including marketing. Porsche AG and VW AG are responsible for all manufacturing "specs" of the Cars including the installation of 3G Only telematics which are the subject of this litigation.

16.    Finally, the misrepresentations alleged herein reflect a single course of action, rather than separate independent acts by the three defendants. Because all defendants jointly participated in the decisions and activities alleged herein, they are jointly and severally liable for all harm caused by their conduct.

17.    The Defendants are jointly and severally liable for the conduct alleged herein, and collectively are referred to in this complaint as "Porsche" or the "Defendants."

## JURISDICTION

18.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1453, because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals; (2) the putative Class consists of more than one hundred proposed class members; (3) the citizenship of at least one class member is different from Defendants' citizenship (New Jersey and Germany);[1] and (4) the aggregate amount in

---

[1]    Because jurisdiction is based on the Class Action Fairness Act, 28 U.S.C. § 1332(d), even though Defendants are limited liability companies, each Defendant is a citizen of the states "where it has its principal place of business and ... under whose laws it is organized." 28 U.S.C. § 1332(d). That is, the rules applicable in traditional non-class diversity cases, under which the citizenship of limited liability companies would be determined by the citizenship of those companies' members, do **not** apply to this case. *Erie Ins. Exch. v. Erie Indemn. Co.*, 722 F.3d 154, 161 n.7 (3d Cir. 2013) (explaining that the Class Action Fairness Act "evinces an intent that suits by unincorporated associations be treated like suits by corporations in that

controversy by the claims of Plaintiff and the putative Class exceeds $5,000,000, exclusive of interest and costs.

19.     This Court also has personal jurisdiction over Defendants because Plaintiff purchased his vehicle in New Jersey from an authorized Porsche dealership as a "new" vehicle.

20.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this District, and the actions of the Defendants' that give rise to the claims against them in this action took place in part at least in this District.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff re-alleges and incorporates the allegations contained in the paragraphs above.

22.     Plaintiff brings this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and a Class consisting of:

> All persons who purchased or leased, anywhere in the United States, a Car, with Porsche Connect with 3G Only Limitations (the "Class").

23.     Plaintiff reserves the right to amend the definition of the Class.

24.     This action is properly maintainable as a class action.

25.     There could be over 300,000 members of the Class based upon Porsche's own public figures of "Affected Models" and "Affected Model Years" sold by Porsche with telematics. Accordingly, joinder of all members is impractical.

---

the citizenship of the association for diversity purposes is determined by the entity's principal place of business and not by the citizenship of its members").

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among questions of law and fact in common to the Class are:

a.     Whether Defendants misrepresented the 3G Only Limitations features of Cars;

b.     The extent of the Porsche Connect features which are inoperative when 3G is phased out;

c.     Whether Defendants in their marketing and sale of the Cars violated the NJCFA, N.J. S.A. §56:8-2, *et seq.* and similar laws of other states in which the vehicles were sold;

d.     Whether Defendants breached express and/or implied warranties when it delivered Cars with Porsche Connect systems with the 3G Only Limitations;

e.     The extent of damages/diminution in value/overcharges resulting from the 3G Only Limited Telematics in the Cars.

27.     Plaintiff's claims are typical of the claims of each member of each of the Class in that Plaintiff alleges a common course of conduct by Defendants toward each member of the Class. Specifically, Defendants violated the NJCFA and similar laws of other states and breached its warranties with each member of the Class. Plaintiff and the other members of the Class seek identical remedies under identical legal theories. There is no antagonism or material factual variation between Plaintiff' claims and those of the Class.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel who have extensive experience prosecuting class actions and

who, with Plaintiff, is fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Classes.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Furthermore, the damage that has been suffered by any individual Class member is likely not enough to sustain the expense and burden of individual litigation. Hence it would be impracticable for all members of the Class to redress the wrongs done to them individually. There will be no difficulty in the management of this action as a class action.

30.     The prosecution of separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to the individual Class members, which could establish incompatible standards of conduct for Defendants. In addition, adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of the interests of the other members of the Classes not parties to such adjudications, or could substantially impede or impair their ability to protect their interests.

31.     The members of the Class are readily identifiable through Defendants' records.

32.     Defendants have acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Classes as a whole.

## SUBSTANTIVE ALLEGATIONS

33.     Consumer Reports succinctly described the situation:

> "As wireless carriers shut down their 3G networks over the coming months, millions of cars are losing the ability to automatically contact first responders after a crash…
> Automatic crash notification, which alerts first responders via a built-in cellular connection, often relies on aging 3G cellular networks to connect drivers with emergency services and share a

8

vehicle's location. Even though automakers have been aware that
these networks are shutting down permanently between February
and July, many manufacturers still relied on it until as recently as
the 2021 model year."

"Shutting down the 3G network to prioritize newer technologies is
positive in the long run," says Alex Knizek, an automotive
engineer at CR. "But it is disappointing that some automakers have
failed to offer a solution to owners of 3G-connected vehicles,
leaving them unable to take advantage of proven and valuable
safety features, as well as other beneficial connectivity functions."

The reason is cost savings, according to Roger Lanctot, director of
automotive connected mobility at Strategy Analytics, a consulting
firm. "It's the last chapter of the automakers adopting the least-
expensive connectivity module they can find," he says. Only
recently did automakers start future-proofing newer models. "It's a
challenge for the industry, but going forward, automakers
recognize that they need to put the latest connectivity in."

In addition to crash notification, many vehicles also have an SOS
button to contact emergency services, and a lot of those buttons
still use a 3G network. It's usually red and located near the
vehicle's dome light or rearview mirror. Some cars may also use
3G connectivity for convenience features such as remote
unlocking, remote start, emergency roadside assistance, navigation
map updates, and vehicle diagnostics. These and other features will
no longer work without an upgrade to newer 4G or 5G technology.
But because of the way many of these vehicles are designed, it can
be difficult or even impossible to upgrade the technology to work
with the newer networks, Lanctot says.

"What a mess," says William Wallace, CR's manager of safety
policy. "Wireless carriers, federal regulators, and some automakers
seem content to leave people out to dry, even if it means they lose
access to a potentially lifesaving technology. Every automaker
should deliver to its customers the services they've been
promised—without charging them extra—and lawmakers should
get ahead of the game to keep this from ever happening again in
the future."

34.    Porsche cars have been sold in the USA since the 50s.

35.    Porsche's are equipped with "Telematics Control Units" ("telematics") connected

to the engine control module which are the instruments which connect the Porsche to internet

service. *See* http://www.tomorrowstechnician.com/Porsche-telematics. December 15, 2020 by

Andrew Madiel. Last accessed August 28, 2022. The Porsche Connect features depend on the

equipment and technology of the telematics systems, not contracts with service providers.

36.    As the public became increasingly aware of the capabilities and benefit of

telematics, car buyers began to demand the connectivity feature from car makers. The benefits

are tangible and can be valued and include, *inter alia*,  reduced insurance premiums and vehicle

diagnosing capabilities which reduce service costs, and fuel expenses. *See*

https://www.incartelematics.com/faq-items/what-cars-have-telematics (March 2021) last

accessed August 27, 2022.

37.    The Porsche telematics system became known as Porsche Connect.

38.    When 3G became available Porsche installed 3G capable telematics in it vehicles

but refused and failed to have the 3G telematics adaptable to the next "generation" of wireless. In

the field of mobile connections, a "generation" generally refers to a change in the fundamental

nature of the service, non-backwards compatible transmission technology, higher peak bit rates,

new frequency bands. Cellular connectivity has characteristic of technology, speed, frequency

and spectral capabilities which are constantly being improved upon.

39.    All manufacturers of 3G devices have long known that 3G was "spectrally

inefficient" and would be phased out as early as possible.

40.    In January 2008, the FCC auction for 700 MHZ spectrum began with Version

Wireless and AT&T winning the biggest share after having stated their intentions to support LTE

a/k/a 4G LTE, the next generation after 3G.

41.    As early as August 2009, carriers supporting 3G began planning their upgrade to

4G LTE. On December 14, 2009 Telia Sonera became the first carrier to offer customers 4G

services. *See* "First in the World with 4G Services," Telia Sonera Press Release December 14,

2009. Accordingly, Defendants knew of the imminent obsolescence of 3G and that industry

standards were rapidly advancing.

42.    In 2014, Defendants marketed their 2014 model year cars with Porsche Connect.

In marketing the Porsche Connect, Defendants made substantial efforts to highlight and

promote the features of Porsche Connect to distinguish the Cars from its competitors'

automobiles by marketing it as more technologically advanced than the competition.

43.    Porsche's promotional materials promised:

**Porsche Connect App Overview**

*What is Porsche Connect?*

Designed as a proprietary connectivity and communication system,
Porsche Connect helps you stay up-to-date on current news events,
manage incoming text messages and phone calls, navigate your
way through dense traffic, and stay linked to your Porsche vehicle.
From locking the doors to accessing vehicle information, Porsche
Connect transforms your smartphone into the perfect remote
control for your Porsche.

Porsche Connect can be found across the entire Porsche lineup.
Porsche Connect Plus is included as standard on 911, Panamera,
and Cayenne models. Porsche Connect and Porsche Connect Plus
are options on 718 Boxster, 718 Cayman, and Macan models.

Unlock the full potential of your Porsche with Porsche Connect.
Our intelligent services provide you with more ways to experience
your Porsche than ever before. Enjoy an excellent analog driving
experience that has been perfectly integrated into the digital world.

The digital services offered vary by vehicle model, model year and
specific country availability. To find out more, compare the service
availability of the individual models in the Porsche Connect Store
or log in with your Porsche ID to learn about the Porsche Connect
services available for your vehicle.

•••

The following provides you with comprehensive information on Porsche Connect and our digital services. Discover the latest models and their feature highlights.

**This is Porsche Connect**

**General**

With Porsche Connect, your digital co-driver is always on board. The wide range of services helps you to have the most comfortable and modern driving experience possible: before, during and after your trip.

Real-time information and seamless communication bring the digital and real worlds together.

**Functions on Demand – Your Special Features in a Single Tap**

For the first time, customers are able to purchase and use individual functions after the purchase of the car. In the Taycan, Functions on Demand can be enabled over the air. This means there is no need for time-consuming trips to the workshop. Instead, new features are just a tap away. So, get ready for the future – in your Porsche.

The same basic representations were made for every "Affected Model Year."

44.    The Cars were factory equipped with 3G only telematics devices but by 2014 3G was 3G already being replaced by 4G LTE.

45.    There was no disclosure or even suggestion that Porsche Connect would be rendered obsolete once 3G was phased out or that the Porsche Connect feature was only temporary or had only a limited life. As to the later model years after 4G became prevalent, Defendants never disclosed that its equipment was one generation behind! To the contrary, Defendant marketed Porsche Connect as a permanent feature of the Car.

46.    Porsche never informed class members of <u>any</u> of the 3G Only Limitations.

47.     In from 2012-2020, Defendants sold 47,007, 51,756, 54,280, 55,420, 57, 202 and 61,568 cars in the USA, respectively for 2014-2019 consisting of the 911, 718, Panamera, Cayenne, Macan and Taycan models.

## PORSCHE KNEW OF IMMIMENT NEW GENERATIONS OF WIRELESS TECHNOLOGY AND COULD HAVE MANUFACTURED TELEMATICS ADAPTABLE TO NEXT GENERATION

48.     Defendant Volkswagen is part of 5G AA Automatic Association ("5G AA") a "registered voluntary association" founded in September 2016 by Audi AG (owned by Volkswagen), Daimler AG and five major 5G patent holders. "5G AA was created to connect the telecom industry to vehicle manufacturers to develop end-to-end solutions for future mobility and transportation services." Christopher Voight Chairman of the 5G AA Board.  *See* https://5gaa.org last accessed August 27, 2022.

49.     5G AA promoted CV2X which, as designed, early on provided a migration path to the anticipated 5G based systems and services. *See* https://enom.wikipedia.org/wiki/Vehicle-to-everything last accessed August 27, 2022.

50.     As a result of Volkswagen's membership in of 5G AA it was very aware of 3G's almost automatic obsolescence in Porsche cars as soon as it was introduced.

51.     Defendants could have but chose not to design build or install telematics with downloadable software or physical spare parts which could allow the devices to continue to connect to wireless "generations" following 3G.

52.     Defendants had the capability to retrofit its 3G telematics and did so once 3G became the prevalent technology, but refused to design the 3G telematics to be retrofitted.

53.     Even after designing and installing the 3G Only Telematics, a technology "fix" for the 3G phase out was not impossible, or even difficult. It would have been costly however,

but Defendants could have done it, or planned in advance by recalling cars and installing upgrades to add 4G and/or 5G capabilities.

54.     Defendants also could have integrated a swappable SIM card into its telematics module which could have allowed the system to upgrade itself to 4G LTD or 5G, but Porsche did not do that.

55.     The 3G phase out does not necessarily automatically disable all devices working on that protocol as it has in the Cars. For example, the iPhone 3GS can connect to Wi-Fi to access internet applications even after the 3G phase out. *See* https://www.zdnet.com/google-amp/home-and-office/_____/3g-is-shutting-down-here-are-the-gadgets-that-still-rely-on-it-do-you-have-one/ ZDNET, June Wan, April 8, 2022. Last accessed August 27, 2022. Software upgrades have been developed to extend the connectivity life of 3G driven devices. *Id.* Google's Pixel 2 was released in October 2017 with hardware/software that could support 4G LTE and had been pre-armed as early as March 2017. In addition, AT&T connected iPhone 6 and Galaxy S4 Mini and later Samsung Galaxy modes and Pixel 2 Goggle models will all continue to work after the 3G phase out as will older phones from Motorola and LG. While Porsche continue to install, promote and sell the 3G only devices, though the end of the Class Period, the major cellular providers have been preparing for years and hence most mobile/smartphone customers are on the 4G and/or 5G network. *See* https://www.verify-this.com/article/mews/verify/technology-verify/you-will-have-to-upgrade-replace-phone-to4g-5g-in 2022-if-you-have-3gVerizon-att-T-Mobile-all-phasing-out-3g/635-e733678c-clcd-485d-9793-7f97c003bcb9  last accessed August 28, 2022.

56.    Defendants did not design, build or install the "Devices" to be able to transition to successors to 3G due to a desire to save on manufacturing costs. *Id*. quoting Ruger Lanfot, Director of Automotive Connected Mobility at Strategy Analytics.

57.    By contrast, General Motors, whose 2015 and later models of Chevrolet, Buick, GMC and Cadillac all had the "OnStar hardware" affected adversely by the 3G sunsetting, announced to its customers:

> In 2021, OnStar began working with AT&T on network updates and started executing over-the-air software updates to ensure Members were not impacted by the network transition.

GM committed to automatically send "over-the-air" software updates free of charge to address the 3G phase-out.

58.    Moreover, the 3G obsolescence issue was entirely foreseeable. Jeremy Barnes, a spokesperson for Mitsubishi, was quoted in Consumer Reports about the 3G phase out:

> "We foresaw this time coming and designed around it"

## SUNSETTING OF 3G AND LOSS OF
## PORSCHE CONNECT FEATURES IN THE CARS

59.    In February 2019, AT&T announced a plan to "sunset" its 3G network. *See* http://www.business.ATT.com/explore/make-the-switch.html last accessed August 27, 2022. 3G "sunsetting" means that a mobile network operator (or carriers) shuts off the cellular infrastructure required to operate devices based on 3G technology.

60.    Notwithstanding that announcement, Porsche sold tens of thousands of 2019 model year 718s, 911s and Cayennes, and tens of thousands more model year 2020 and 2021 718s with 3G Only Telematics.

61.    According to Porsche announcements:

As a result of the sunset of 3G service by wireless carrier partners by February 2022, Porsche vehicles factory-equipped with 3G telematics devices or retrofitted 2G vehicles will no longer be able to receive any ConnectedDrive/Porsche Assist services. Some vehicles factory-equipped with 4G telematics devices will no longer have access to services that require a voice connection, such as PORSCHE Assist eCall and Concierge Services, but will continue to receive certain ConnectedDrive/Porsche Assist services such as Advanced Real-Time Traffic Information, Remote Services and Porsche Online depending on you Porsche model.

## AFFECTED PORSCHE MODELS AND YEARS MAKING UP THE CLASS

62.    Porsche announced the following "Affected Models" and "Affected Model Years" in its website:

| Affected Models | Affected Model Years |
|---|---|
| 911 | 2017 – 2019 |
| Cayenne | 2015 – 2019 |
| Macan | 2017 – 2018 |
| 718 | 2017 – 2021 |
| Panamera | 2014 – 2018 |
| 918 Spyder | 2014 |

## DEFENDANTS' CONCEALMENT AND OMISSIONS CAUSED LOSS AND DAMAGE TO CAR BUYERS

63.    Had the Defendants truthfully disclosed and reported that its Porsche Connect telematics for the Cars were 3G only, consumers would have been less likely to purchase the cars, would have abstained outright or sought substantial discounts and/or upgrades.  As a proximate cause of Defendants' misrepresentations detailed in this complaint,  Plaintiff and class

16

members purchased Class Vehicles in reliance on Defendants' misrepresentations and omissions in the mistaken belief that their telematics could adapt to changing technology.

64.    Plaintiff and the class members who purchased Cars did not get the benefit of the bargain they struck. They paid for Cars under the mistaken belief that their cars Porsche Connect telematics would work for the life of the Car as all other options. Instead, they received Cars whose Porsche Connect telematics had planned obsolescence and were therefore of lesser value because the Porsche Connect was destined for obsolescence as soon as it was issued. The Cars that Plaintiff and the class members paid for and bargained to receive, while marketed as products with Porsche Connect telematics were of lesser value than as advertised. Accordingly, purchasers of the Cars, including Plaintiff and class members, have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Cars.

65.    The Defendants' misrepresentations and deceptive conduct in failing to truthfully disclose to prospective buyers that the Cars were 3G Only caused Plaintiff and class members substantial injury in the form of price premiums and overpayments for products and diminished resale value and loss of telematics benefits described herein that are severely limited.

## TOLLING

66.    **Tolling of the Limitations Period** The Defendants had actual knowledge for several years that the marketing and advertising of its Cars was deceptive and misleading.

67.    **Continuing Act Tolling** Beginning in or around 2014, Defendants continuously marketed and sold the Cars to unsuspecting car buyers. The Defendants continuously represented these vehicles could adapt to technology. By continuously repeating these false

representations and failing to disclose that the Cars were 3G only the Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Porsche might seek to apply.

68.     At all relevant times, the Defendants knew that they were concealing and misrepresenting material facts, but continued to misrepresent and conceal information in its marketing and sales materials.  Plaintiff and class members' claims are not time barred.

69.     **Fraudulent Concealment Tolling** State consumer protection laws, together with the doctrine of equitable tolling and/or the discovery rule, toll the applicable statutes of limitations for all class members because of Defendants' conduct, including but not limited to concealment and omission of material facts.

70.     This duty to disclose arose, among other things, due to the Defendants' control over manufacturing, marketing and representations about the Cars and Porsche Connect.

71.     The Defendants knew about the 3G Only Limitations of the Cars ever since they started selling the Cars.

72.     Despite their knowledge, the Defendants actively concealed this material information from the Plaintiff and other class members.

73.     The Defendants actively concealed the information to continue to profit from their sale and prevent Plaintiff and other class members from bringing suit or otherwise seeking redress.

74.     Plaintiff and class members justifiably relied on the Defendants to disclose the true nature of the Cars they purchased, because the truth was not discoverable by Plaintiff and the other class members through reasonable efforts. Any applicable statute of limitations has

been tolled by the Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

75.     Defendants are estopped from asserting that statutes of limitations were running for the duration of time Class Members were unaware of Defendants' misrepresentations.

76.     Defendants are equitably estopped from asserting the statutes of limitations ran against the claims of class members.

77.     Additional information supporting allegations of misrepresentations is in the control of the Defendants.

78.     Material information concealed and/or actively suppressed by the Defendants includes but is not limited to the 3G Only Limitations, described in the preceding paragraphs.

79.     Defendants had a duty to disclose to Class members the 3G Only Limitations.

80.     Defendants breached express and implied warranties and actively and affirmatively misrepresented, concealed and suppressed, both pre-sale and post-sale, the existence of the 3G Only Limitation.

## <u>UNCONSCIONABLITY OF DEFENDANTS' CONDUCT</u>

81.     The warranties accompanying Cars were procedurally and substantively unconscionable under Uniform Commercial Code § 2-302 and other applicable state warranty laws because of the disparity in bargaining power of the parties and the purchasers' lack of knowledge that Cars had 3G only limitations.[2]

---

[2] New Jersey Uniform Commercial Code § 2-302 (NJ Stat. Ann. § 12A:2-302) states in pertinent part:

> (1)     If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

82.     The contractual terms were unreasonably favorable to the Defendants since the Defendants were fully aware of the 3G only limitations but proposed class representative and class members were unaware. The bargaining position of the Defendants for the sale of Cars was grossly disproportionate and vastly superior to that of individual vehicle purchasers, including the proposed class representative and class members.

83.     The Defendants' conduct renders the Cars purchase contract so one-sided as to be unconscionable under the circumstances existing at the formation of the vehicle purchase contract.

84.     The durational limitation of the warranties accompanying the Cars is unreasonable and unconscionable since the Defendants actively concealed the 3G only limitations. The proposed class representatives and class members had no notice of or ability to detect the issue.

85.     Defendants engaged in unconscionable commercial practices.

86.     Defendants' unconscionable conduct precludes any exclusion of incidental and consequential damages or any other limitation of remedies.   The Defendants' upper-level management orchestrated this wrongful conduct.

87.     The proposed class representative and class members operated and maintained their Cars in conformity with the respective owner's manual and Service and Warranty requirements.

---

(2)     When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

88.    The Defendants violated the consumer protection laws of New Jersey together with all other state  consumer protection  laws with their unconscionable  conduct described in this complaint including but not limited to their failure to disclose material information that caused ascertainable financial harm to the proposed class representative and class members.

89.    Car owners have sustained an ascertainable financial loss.  Individuals who own or have owned Cars also sustained diminution of the resale value of their Cars.

90.    The proposed class representative and class members have not received the benefit of their bargain concerning their respective purchase of Cars.

91.    If the proposed class representative and class members had been made aware of the 3G only limitations in their respective Cars and the attendant ramifications of value, safety and care,  they would not have purchased the Cars or would have paid less for their vehicles.

92.    As a direct result of these knowing misrepresentations and omissions, the proposed class representative and class members purchased Cars and sustained economic harm since they purchased vehicles worth considerably less than represented.  These misrepresentations diminish the value and increased cost of vehicle ownership.

93.    The wrongful conduct of the Defendants in violation of the consumer protection laws of New Jersey together with all other similar state consumer protection laws occurred within the limitations period set out in the respective statutes and/or the limitations period as tolled by the Defendants' conduct.

## THE INJURIES SUFFERED BY PLAINTIFF AND OTHER CLASS MEMBERS

94.    Plaintiff and all purchasers  and lessees of the Cars (who, as detailed below are the members of the putative Classes) have suffered injury  and been damaged by Defendants' unconscionable practices and breaches of its warranties.  Specifically,  Plaintiff  and all members

of the putative Class paid for a Car that was represented and warranted by description as including Porsche Connect which could "adapt" to changing technology, but the Cars they received had 3G Only Limitations which eventually rendered the features inoperable.

95.    Plaintiff and all members of the putative Classes received vehicles that were substantially less valuable than the vehicles that Defendants represented and warranted to them, due to the failure of Defendants to deliver a specific, bargained-for characteristic.

## COUNT I

**Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, *et seq.*
(On Behalf of the Nationwide Class or Subclasses of State Buyers)**

96.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

97.    Plaintiff brings this claim against Porsche on behalf of themselves and the Class.

98.    Porsche has engaged in deceptive, unfair, fraudulent and/or misleading commercial practices in the advertising, promotion, marketing, distribution, selling and leasing of Cars.

99.    Porsche represented that Cars had characteristics, uses, benefits, or qualities that they did not have.

100.    In its advertising, promotion, and marketing of the Cars, Porsche misrepresented material facts to Plaintiff and other members of the Class with respect to the vehicles' qualities. As detailed above, Porsche's deceptive advertising, promotion, and marketing of the Cars emanated from New Jersey but was originated Porsche AG.

101.    Porsche's conduct was objectively deceptive and had the capacity to deceive reasonable consumers under the circumstances. The fact that the Cars' Porsche Connect was not compatible with 5G was a material fact to which a reasonable consumer would attach importance at the time of purchase or lease.

22

102.     Porsche's practices, as detailed herein, violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

103.     As a direct and proximate result of Defendants' violations of the New Jersey Consumer Fraud Act, Plaintiff and other members of the Class have suffered ascertainable losses, which include but are not limited to, the diminished value of their vehicles and the failure to receive the benefit of the bargain promised to them by Defendants (i.e., the vehicles they received were less valuable at the time of purchase or lease than the vehicles Defendants promised to them); and the substantial out-of-pocket costs which will be required to make Porsche Connect operable on a 5G system. Accordingly, Plaintiff and other members of the Class were harmed by, and Defendants are liable for, Defendants' actions in violation of the New Jersey Consumer Fraud Act.

104.     Defendants are liable to Plaintiff and the members of the Class for treble damages caused by their deceptive conduct, and for reasonable attorneys' fees as set forth in the New Jersey Consumer Fraud Act.

## COUNT II

**Breach of Express Warranty by Description in Violation of N.J. Stat.§ 12A:2-313(b) (On Behalf of the Nationwide Class Or Alternatively State Subclasses)**

105.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

106.     Plaintiff brings this claim against Defendant on behalf of themselves and the Nationwide Class pursuant to Section 2-313(b) of the Uniform Commercial Code, adopted under New Jersey law pursuant to N.J. Stat. § 12A:2-313(b). That section provides: "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to that description."

107.    Defendants described Porsche Connect in its advertisements, press releases, specifications provided to dealers, information provided to the press, and through other media as adaptable to changing technologies which it knew would be communicated to consumers either directly or indirectly. Defendants' description included that the Porsche Connect would function as represented for the life the Cars indefinitely were express warranties by description under N.J. Stat. $ 12A:2-313(b).

108.    Defendants' express warranties by description were designed to induce Plaintiff and other members of the Class to purchase the Cars.

109.    Defendants express warranties by description became part of the basis of the bargain into which Plaintiff and other members of the Class entered when they purchased the Cars.

110.    Given the modern significance of compatibility of vehicles with cell phones, protocols and wireless standards as represented by Porsche's prominent representations. The natural tendency of the descriptions of Porsche Connect was to induce the purchase or lease of the Cars.

111.    Defendants' breached express warranties by description with Plaintiff and other members of the Class by delivering Cars that were not, and never could be, compatible with later generators of service.

112.    By delivering a vehicle with Porsche Connect limited to 3G only and lacking compatibility with next generations, Defendants has breached its express warranty by description to the purchasers and lessees of the Cars, including the Plaintiff and members of the Class.

113.    As a direct and proximate result of Defendants' breach of its express warranties by description  with Plaintiff  and the members  of the Class, Plaintiff and the members  of the Class did not receive  the full benefit of their bargain  and suffered damage by receiving  vehicles that were less valuable than the vehicles  that Defendants had represented  to them,  and by paying  out-of-pocket  costs in order to ensure that the Cars Porsche Connect features could operate on next generation facilities.

114.    Defendants are liable to Plaintiff and the members of the Class for all damages caused by Defendants' breach  of express warranties  by description.

## COUNT III

### Violation Of Magnuson-Moss Warranty Act, 15 U.S.C. §2310(d)1(A)
### (On Behalf of the Nationwide Class)

115.    Plaintiff incorporates the foregoing paragraphs as if set forth fully in this count.

116.    This claim is brought as a state law claim under 15 U.S.C. § 2310(d)(l)(A) and is before this Court as a supplemental state court claim for each of the state subclasses pursuant to diversity jurisdiction under CAFA.

117.    The proposed class representative and class members  are consumers within the context of the Magnuson-Moss Warranty Act,  15 U.S.C.  § 2301(3).

118.     Cars are consumer products within the context of the Magnuson-Moss Warranty Act,  15 U.SC.  $ 2301(1).

119.    The Defendants are suppliers and/or warrantors within the context of the Magnuson-Moss Warranty Act,  15 U.S.C.  §§ 2301(4)-(5).

120.    The Defendants' express warranties are written warranties within the context of the Magnuson-Moss Warranty Act,  15 U.$.C.  $ 2301(6).  Cars implied warranties created by

operation of state law are incorporated into the Magnuson-Moss Warranty Act as modified by§ 2308.

121.    The Defendants breached the express and implied warranties accompanying Class Vehicles as described in this complaint.

122.    The Magnuson-Moss Warranty Act provides a claim for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

123.    The Defendants' breach of their express and implied warranties was the direct and proximate cause of the proposed class representative and proposed class members' financial harm as more fully set out in the preceding warranty counts, and constitutes a violation of the Magnuson• Moss Warranty Act.

124.    Affording Defendants a reasonable opportunity to cure their breach of written warranties for Class Vehicles would be unnecessary and futile. The proposed class representative and class members have already attempted to secure coverage for their battery-related repairs without success.

125.    At the time of sale or lease of each Class Vehicle, the Defendants knew, should have known, or were reckless in not knowing of their misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the limitation, as described in this complaint. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Cars resort to an informal dispute resolution procedure and/or afford the Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

126.    The proposed class representative and class members would suffer economic hardship if they returned their Cars but did not receive the return of all payments made by them.

127.    Wherefore, proposed class representative and proposed class members demand judgment against the Defendants including multiple monetary damages, interest, costs and attorney's fees.

**COUNT IV**

**Unjust Enrichment**

128.    Plaintiff incorporates the foregoing paragraphs as if set forth fully in this count.

129.    The Defendants benefited financially from their breaches of warranty and misrepresentations as described in this complaint.

130.    The proposed class representative and class members sustained monetary damages as described in this complaint.

131.    Allowing the Defendants to retain their monetary enrichment from their wrongful and unlawful acts would be unjust and inequitable.

132.    The proposed class representative and class members request that the Defendants disgorge their profits from their wrongful and unlawful conduct and that the Court establish a constructive trust funded by the benefits conferred upon the Defendants as a result of their wrongful conduct. The proposed class representative and class members should be designated beneficiaries of the trust and obtain restitution for their out-of-pocket expenses caused by the Defendants' conduct.

133.    Wherefore, the proposed class representative and class members demand judgment against defendant for multiple damages, interest, costs and attorneys' fees.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a.      Certifying this action as a class action under Federal Rule of Civil Procedure 23, and appointing Plaintiff as class representative and his attorneys as class counsel;

b.      Awarding actual damages to Plaintiff and the Members of the Class;

c.      Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d.      Awarding such other and further relief which the Court finds just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims  so triable.

Dated: October 17, 2022

SQUITIERI & FEARON, LLP


By:*/s/Lee Squitieri*
        Lee Squitieri
305 Broadway
7th Floor
New York, New York 10007
(212) 421-6492